UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Crim. No. 18-CR-212 (APM) |
| | : | |
| v. | : | |
| | : | |
| **JOSHUA HUBBARD,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. For the reasons herein, the United States requests that the Court sentence the defendant to a period of 11 months of incarceration, to be followed by one year of supervised release. The government is not requesting any fines or restitution in this case other than required court costs. In support of this sentence, the government states the following.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 19, 2010, Defendant Joshua Hubbard (the "Defendant") was convicted of Robbery in Superior Court for the District of Columbia in case number 2010-CF2-013136. The Defendant was sentenced to 48 months in prison followed by two years of supervised release.

On or about October 5, 2017, the United States Parole Commission revoked the Defendant's Supervised Release and resentenced the Defendant to 13 months confinement.

The Defendant was serving his sentence at a Federal Correctional Institution in Petersburg, Virginia. As part of the Defendant's sentence, he was found eligible to complete a remaining portion of his sentence at the Residential Reentry Center in Washington, D.C. (Hope Village, Inc., 2840 Langston Place, S.E., Washington, D.C.) (hereinafter, "Hope Village").

On May 15, 2018, the Defendant signed a Furlough Application acknowledging his understanding of the terms of the furlough release conditions and transfer to Hope Village. The Defendant's Conditions of Furlough included the Defendant's agreement that while on furlough, he is subject to prosecution for escape if he fails to return to the institution at the designated time.

On June 12, 2018, the Defendant arrived at Hope Village. Within 24 hours of arrival, Defendant Hubbard had already violated the terms of his placement. (Ex. 1). Within eight days of living at Hope Village, Defendant Hubbard had been written up for four different infractions. (Ex.1).

On June 20, 2018, members of the Piedmont Jail Staff arrived at Hope Village to remand the Defendant into custody for failing to obey the rules of the Hope Village program. At approximately 1:47 p.m., immediately after the Piedmont Staff arrived, the Defendant jumped out of a window and fled the halfway house and did not return.

On July 16th, 2018, Metropolitan Police Department (MPD) officers were dispatched to V-1's home for a domestic assault. Officers spoke with V-1 and V-1 named Defendant Hubbard as the person that struck her multiple times in the face leaving contusions about the left side of her face.

On July 20, 2018, officers followed up on the report and went to V-1's residence. There, officers encountered Defendant Hubbard in a rear room. Defendant Hubbard lied to the officers and told them that his name was "Kenneth Jones." After determining that this was a false name, officers asked V-1 who the man was, and she told them that he was Joshua Hubbard. At this point, Defendant Hubbard fled to the back bedroom, closed the door, and escaped through a bedroom window. Defendant Hubbard led the police on a short foot chase. Officers found Defendant Hubbard hiding under a stairwell at 1513 Gales Street, Northeast. Once officers located Defendant

Hubbard hiding at this location, he again tried to flee but was caught as he tried to climb over another fence in this residential neighborhood. After Defendant Hubbard's arrest, V-1 confirmed to officers that Defendant Hubbard assaulted her on July 16, 2018. The Defendant was ultimately arrested.

While Defendant claimed that he had decided to commit the crime of escape to be with his father, that is simply not what his actions show. He was found after MPD responded to a domestic violence assault. He then lied to officers about his name and jumped out of a second window.

## DISCUSSION AND RECOMMENDATION

### I.    Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  See United States v. Gall, 128 S. Ct. 586, 596 (2007).  The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
>         (i) issued by the Sentencing Commission ...;

and
(ii) that, . . . are in effect on the date the defendant is sentenced; ...

(5) any pertinent policy statement –
    (A) issued by the Sentencing Commission ... and
    (B) that, . . . is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

## II.   Defendant's Sentencing Guidelines Calculation

### A.   Total Offense Level

As stated on page 2 of the Criminal History Calculation, the base offense level for this offense is 13, pursuant to U.S.S.G. § 2P1.1(a)(1). Four points are subtracted from that score because of the nature of the defendant's confinement (his placement at a halfway house). U.S.S.G. § 2P1.1(b)(3). An additional two points are subtracted from that score in light of the Defendant's acceptance of responsibility in this case, resulting in a total offense level of 7. U.S.S.G. § 3E1.1(a).

### B.   Criminal History Category

Based on his prior convictions, Defendant has 5 criminal history points; however, two additional points should be added under § 4A1.1(d), resulting in a total score of 7 and criminal history category of IV. Although Defendant contends that the additional two points should not apply as it would result in "double counting," there is substantial case law by multiple Circuits rejecting that very argument. For instance, in United States v. Vickers, 891 F.2d 86 (5th Cir. 1989), the Fifth Circuit concluded that "[w]e find no exception to the application of the enhancement provisions of Chapter Four of the Guidelines to the base offense level assigned to

4

the offense of unlawful escape from custody. We therefore are constrained to presume that the Sentencing Commission contemplated that under Guidelines sections 4A1.1(d) and (e), points would be added to an individual defendant's base offense level for a conviction pursuant to 18 U.S.C. § 751(a)." Id. at 88; *see also* United States v. Goldbaum, 879 F.2d 811, 813-814 (10th Cir. 1989) (rejecting "double counting" argument and concluding that "in the absence of any contrary intent we must apply the clear language of the guideline and presume that in formulating the base level specified for the crime of escape in Guideline § 2P1.1, the Sentencing Commission had in mind that under Guidelines §§ 4A1.1(d) and (e), points would be added to the particular defendant's criminal history category thereby enhancing the sentence."); United States v. Ofchinick, 877 F. 2d 251, (3d Cir. 1989) (also rejecting double counting argument).

Moreover, given that these decisions are nearly 30 years old, had the Sentencing Commission believed that the Circuits were incorrectly adding the two points, it could certainly add language to the Guidelines (or add an Application note) that clarified that the enhancements do not apply to an Escape charge.

Even if the Court were to disregard the applicable statutes, Defendant Hubbard was still under supervision in 2017 DVM 000962. Defendant Hubbard asks the Court to ignore this fact as well.

    **C.    Sentencing Guideline Range**

A total offense level of 7 and criminal history category of IV, result in a guideline imprisonment range of 8 to 14 months.

**III.    Sentencing Recommendation**

As stated above, the government requests a sentence of 11 months of incarceration followed by 1 year of supervised release. This sentence is in the middle of the Defendant's applicable guidelines range.

**A.    The Nature of the Offense**

The defendant left Hope Village within eight days of arrival. He was found by MPD and fled again after lying about his name. At no point does he allege that he took any steps to turn himself in to law enforcement.[1] Also concerning is that within eight days at Hope Village the defendant had committed multiple infractions as detailed in exhibit one.

The government recognizes that the charge of Escape is not one with an identifiable victim, but the Government again attaches the victim letter from the victim of the Defendant's domestic assault. This is the victim whose apartment the defendant fled from as MPD officers attempted to arrest him. Additionally, although Defendant Hubbard is dismissive of the purpose of the halfway house in providing reentry assistance, Defendant Hubbard could have benefited from the services at the time he walked away. Instead, he committed additional crimes. The very purpose that reentry assistance was designed to promote, with the ultimate goal of reducing recidivism.  *See, e.g.*, S. David Mitchell, Impeding Reentry: Agency and Judicial Obstacles to Longer Halfway House Placements, 16 Mich. J. Race & L. 235, 237–38 (2011) ("Absent adequate attention to transitional services such as housing, employment, and substance abuse treatment, empirical research has indicated that approximately two-thirds of released offenders will recidivate within three years.") (citing Patrick A. Langan & David J. Levin, Bureau of Justice Statistics, U.S. Dep't of Justice,

---

[1] In contrast to the case of <u>United States v. Weems</u>, 18-CR-136 (JDB), where the defendant tried to turn himself in to MPD on multiple occasions just days after leaving the halfway house (a case in which Judge Bates ultimately issued a Guidelines' compliance sentence).

6

Pub. No. 193427, Special Report: Recidivism of Prisoners Released in 1994 1 (2002)).[2] The services available through halfway houses provide necessary services during this period of transition; these services benefit not only the defendant, but also the community as a whole, by reducing the likelihood that the defendant will reoffend. *See* Jennifer Borges, The Bureau of Prisons' New Policy: A Misguided Attempt to Further Restrict a Federal Judge's Sentencing Discretion and to Get Tough on White-Collar Crime, 31 New Eng. J. on Crim. & Civ. Confinement 141, 142 (2005) (noting that halfway houses and community confinement centers "make the transition back into the community easier for offenders by allowing them to participate in work-release programs, community activities, treatment, and maintain ties to family members, including children or ill parents.")

### B.     The History and Characteristics of the Defendant

The defendant has a clear history of escapes and violent crimes, including robbery and domestic related assaults. As a result of that conduct, he finds himself in the current position. The Defendant's criminal history score takes into account his characteristics. The defendant can only report six months of employment from 2016 to 2017.

The facts and circumstances of Defendant's instant arrest (including the alleged assault and flight), raise serious concerns about which path he has elected to take.

### C.     The Need for the Sentence Imposed

Given the defendant's acceptance of responsibility in this case, the government believes that a sentence of 11 months of confinement (in the middle of the guidelines range) is the appropriate sentence, to be followed by 1 year of supervised release. Issuing a time served sentence

---

[2] In enacting the Second Chance Act, Congress recognized the importance of community correctional facilities (such as halfway houses) in assisting prisoners in transition into the community. Second Chance Act of 2007, Pub. L. No. 110-199, 122 Stat. 657 (2008), § 251.

would only further embolden prisoners at Hope Village, letting them know that they can walk away from the facility at their whim and face no further sanction for committing this additional crime.

                Respectfully submitted,
                JESSIE K. LIU
                UNITED STATES ATTORNEY


By:      /s/_____
                Kevin L. Rosenberg
                Ohio 0081448
                Assistant United States Attorney
                District of Columbia
                Violent Crimes & Narcotics Trafficking Section
                555 4th Street, NW, Room 4124
                Washington, DC 20530
                (202) 252- 7833
                Kevin.Rosenberg@usdoj.gov